### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF NEW YORK

NXIVM CORPORATION, EXECUTIVE
SUCCESS PROGRAMS, INC., ALEX
BETANCOUT, BARBARA BOUCHEY,
CLARE W. BRONFMAN, EDGAR BOONE,
ELLEN GIBSON, SARA R. BRONFMAN,
PAMELA CAFRITZ, SUZANNE KEMP,
WAYNE BATES, LUIS MONTES, and
FRANCA DICRENSENZO,

        Plaintiffs,

        -against-

JOSEPH J. O'HARA, DOUGLAS RUTNIK,
and DENISE F. POLIT,

        Defendants.

No. 05-cv-01546 (GLS/RFT)

---

**INTERVENOR RICK ROSS'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS'
MOTION FOR AN ORDER (1) PROHIBITING DEFENDANT JOSEPH J. O'HARA, ESQ.
FROM DISCLOSING PRIVILEGED AND CONFIDENTIAL INFORMATION TO THIRD
PARTIES, (2) REQUIRING THE RETURN OF PLAINTIFFS' FILES, (3) COMPELLING
DISCOVERY AND (4) QUASHING THIRD-PARTY SUBPOENA TO O'HARA**

---

**LOWENSTEIN SANDLER PC**
Attorneys at Law
65 Livingston Avenue
Roseland, New Jersey  07068
Telephone:  973.597.2500
Facsimile:  973.597.2400
Attorneys for Intervenor Rick Ross

On the Brief:
    Peter L. Skolnik, Esq.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES.................................................................................... iii

PRELIMINARY STATEMENT ............................................................................. i

COUNTER STATEMENT OF FACTS ....................................................................8

    A.    Introduction. ............................................................................................8

    B.    Interfor's *Ex Parte* Contacts with Defendant Rick Ross.......................9

    C.    The Press Contacts Ross, and His Attorneys Serve Subpoenas on Interfor..........11

    D.    O'Hara Contacts Ross. ...........................................................................12

ARGUMENT......................................................................................................16

    I.    THIS COURT SHOULD STAY ITS DECISION ON NXIVM'S
        MOTION TO QUASH, AND DEFER TO THE ADJUDICATION OF
        THE CRIME-FRAUD AND PRIVILEGE ISSUES BY THE COURT IN
        THE DISTRICT OF NEW JERSEY HEARING THE UNDERLYING
        *NXIVM V. ROSS* ACTION ...............................................................16

    II.    COMMUNICATIONS AND DOCUMENTS RELATED TO
        INTERFOR'S "INVESTIGATION" OF RICK ROSS ARE NOT
        PRIVILEGED; THEY ARE DISCOVERABLE...................................22

        A.    Interfor's Investigation of Rick Ross is Subject to the Crime-Fraud
            Exception to the Attorney-Client and Work Product Privileges. .............22

            1.    If Attorneys Supervised the Interfor Investigation, They
                Violated the Rules of Professional Conduct................................25

            2.    NXIVM Directed Interfor Unlawfully to Obtain Mr. Ross's
                Bank and Telephone Records ......................................................29

            3.    The Cases Cited by NXIVM Approving "Investigations" of
                a Party In Active Litigation Involve Dramatically Different
                Factual Settings Than the Wholesale Intrusion Involved in
                This Case ...................................................................................31

            4.    Ross and the Court are Entitled to Discover What Other
                Criminal Mischief NXIVM and Interfor Conspired to
                Commit ......................................................................................32

B.     NXIVM Has Waived Any Attorney Client Privilege It Might
       Otherwise Have Been Able to Claim ......................................................34

C.     This Court Need Not Determine the Nature of Any Work Product
       In O'Hara's Possession, Because Such Work Product Is In Any
       Event Necessary for Ross's Prosecution of His Counterclaims in
       the New Jersey Action. ..........................................................................37

CONCLUSION......................................................................................................40

## TABLE OF AUTHORITIES

*AM International, Inc. v. Eastman Kodak Co.*, 217 U.S.P.Q. 1001 (N.D. Ill. 1982) ..................38

*Apple Corps Ltd. v. Inter'l Collectors Soc.*, 15 F. Supp. 2d 456 (D.N.J. 1998) ....................31, 32

*In re Application for Order Quashing Deposition Subpoenas, dated July 16, 2002,*
    2002 WL 1870084 (S.D.N.Y 2002)  .............................................................................20

*In re Application of FB Foods, Inc.*, 2005 WL 2875366 (S.D.N.Y. 2005) ...............................20

*Bird v. Penn Central Co.*, 61 F.R.D. 43 (E.D. Pa. 1973) .............................................................38

*Coleman v. American Broadcasting Cos.*, 106 F.R.D. 201 (D.D.C. 1982)..................................24

*Cooksey v. Hilton International Co.*, 863 F.Supp. 150 (S.D.N.Y. 1994).....................................24

*Costa v. AFGO Mechanical Services, Inc.*, 237 F.R.D. 21 (E.D.N.Y. 2006) ..............................28

*Devlin v. Transportation Communications International Union,*
    2000 WL 249286 (S.D.N.Y. 2000) ........................................................................ 19, 20

*Diamond v. Stratton*, 95 F.R.D. 503 (S.D.N.Y. 1982).................................................................24

*In re Digital Equipment Corp.*, 949 F.2d 228 (8th Cir. 1991) .............................................17, 20

*Employers Mut. Cas. Co. v. Key Pharmaceuticals, Inc.*, 871 F.Supp. 657
    (S.D.N.Y. 1994) .............................................................................................................31

*Fellerman v. Bradley*, 99 N.J. 493 (1985)..................................................................................24

*Fullerton v. Prudential Ins. Co.*, 194 F.R.D. 100 (S.D.N.Y. 2000)............................................37

*Garrett v. Metropolitan Life Ins. Co.*, 1996 WL 325725 (S.D.N.Y. 1996).................................32

*GFI, Inc. v. Franklin Corp.*, 265 F.3d 1268 (Fed. Cir. 2001) .....................................................37

*Gidatex, S.r.L. v. Campaniello Imports, Ltd.*, 82 F. Supp. 2d 119 (S.D.N.Y. 1999)...................31

*In re Grand Jury Proceedings*, 604 F.2d 798 (3d Cir. 1979)................................................23, 30

*In re Grand Jury Subpoena*, 223 F.3d 213 (3d Cir. 2000).............................................. 29, 30, 34

*In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d 1032 (2d Cir.
    1984)....................................................................................................................23, 29

*In re Grand Jury Subpoenas Dated December 18, 1981 and January 4, 1982*,
 561 F.Supp. 1247 (E.D.N.Y. 1982)................................................................36

*Gutter v. E.I. Dupont De Nemours*, 124 F.Supp.2d 1291 (S.D. Fla. 2000)...........................23, 24

*Hasbrouck v. BankAmerica Hous. Servs.*, 187 F.R.D. 453 (N.D.N.Y. 1999)..............................16

*Hawkins v. Stables*, 148 F.3d 379 (4th Cir. 1998) ......................................................37

*In re Heuwetter*, 584 F.Supp. 119 (S.D.N.Y. 1984) ..............................................24, 30

*Irving Trust Co. v. Gomez*, 100 F.R.D. 273 (S.D.N.Y. 1983) ......................................24

*In re John Doe*, Inc.,13 F.3d 633 (2d Cir. 1994) .......................................................25

*LaClede Professional Products, Inc. v. Sultan Dental Products Ltd.*,
 1999 WL 92545 (S.D.N.Y. 1999) ...................................................... 19, 20, 21

*Locke v. Aston*, 31 A.D.3d 33 (N.Y.A.D. 2006) .........................................................31

*Madanes v. Madanes*, 199 F.R.D. 135 (S.D.N.Y. 2001) ............................................24

*Midwest Motor Sports v. Arctic Cat Sales, Inc.*, 347 F.3d 693 (8th Cir. 2003) .............. 26, 27, 28, 29

*National Education Training Group, Inc. v. Skillsoft Corp.*, 1999 WL 378337
 (S.D.N.Y. 1999) ..................................................................................36

*Nguyen v. Excel Corp.*, 197 F.3d 200 (5th Cir. 1999) ......................................................37

*NXIVM v. the Ross Institute, et al.*, No. 06-cv-01051 ...................................................1

*Ocean Spray Cranberries, Inc. v. Holt Cargo Systems, Inc.*, 345 N.J. Super 515
 (Law Div. 2000) ............................................................................24, 25, 29

*In re Orthopedic Bone Screw Products Liability Litigation*, 79 F.3d 46 (7th Cir. 1996).......18, 19

*Pactel Personal Communications v. JMB Reality Corp.*, 133 F.R.D. 137 (E.D. Mo. 1990)........18

*PaineWebber, Inc. v. Zinsmeyer Trusts P'ship*, 187 F.3d 988 (8th Cir. 1999)...........................37

*Papanicolaou v. Chase Manhattan Bank, N.A.*, 720 F. Supp. 1080 (S.D.N.Y. 1989)..................26

*Petersen v. Douglas County Bank & Trust Co.*, 940 F.2d 1389 (10th Cir. 1991).........................17

*Rattner v. Netburn*, 1989 WL 223059 (S.D.N.Y. Jun. 20, 1989) .................................................24

*Reavis v. Metropolitan Property and Liability Ins. Co.*, 117 F.R.D. 160 (S.D. Cal. 1987)..........38

*Sackman v. Liggett Group, Inc.*, 173 F.R.D. 358 (E.D.N.Y. 1997)...............................................24

*Schneider National Bulk Carriers v. Health And Welfare Fund*, 918 F. Supp. 272
    (E.D. Wis. 1996)..................................................................................................................18

*In re  Sealed Case*, 141 F.3d 337 (D.C. Cir. 1998)............................................................19, 20

*Smith v. WNA Carthage, L.L.C.*, 200 F.R.D. 576 (E.D. Tex. 2001)............................................28

*State of N.Y. v. Solvent Chemical Co., Inc.*, 166 F.R.D. 284 (W.D.N.Y. 1996)....................24, 26

*U.S. v. Ackert*, 169 F.3d 136 (2d Cir. 1999) ................................................................................36

*U.  S. v. Jacobs*, 117 F.3d 82 (2d Cir. 1997) ..........................................................................25, 34

*U.S. v. Schlesinger*, 438 F.Supp. 2d 76 (E.D.N.Y. 2006) ...........................................................36

*U.S. v. Zolin*, 491 U.S. 554 (1989)........................................................................................22, 25

*Verschoth v. Time Warner, Inc.*, 2001 WL 546630 (S.D.N.Y. 2001).........................................35

*In re von Bulow*, 828 F.2d 94 (2d Cir. 1987).......................................................................36, 37

*Ward v. Maritz, Inc.*, 156 F.R.D. 592 (D.N.J. 1994) .........................................................24, 26,
                                                                                                                          28, 29

## Statutes and Rules

28 U.S.C. 1404 and 1406 .............................................................................................................30

28 U.S.C. § 1407(b) .....................................................................................................................18

Fed. R. Civ. P. 26(c) ..............................................................................................................18, 19,
                                                                                                                          20, 21, 28
Fed. R. Civ. P. 26(b)(3)................................................................................................................28

Fed. R. Civ. P. 45 ....................................................................................................................17, 19

Model Rule 4.2  ....................................................................................................................26, 27, 28

New York Disciplinary Rule 7-104 .......................................................................................25, 26

8 Wigmore Evidence § 2311   ......................................................................................................35

## PRELIMINARY STATEMENT

### A.   Introduction

As counsel for Rick Ross (hereinafter "Ross") advised this Court in our October 3, 2006 letter requesting permission to intervene in the above-captioned matter,[1] Rick Ross operates a web site at www.rickross.com as a public resource, where individuals can examine and discuss information about cults, destructive cults, controversial groups and movements, and numerous other related subjects.  Mr. Ross also provides services as a cult intervention specialist, helping families who seek assistance in facilitating discussions with family members who have become involved with cults and other controversial groups or movements.  In August 2003, Plaintiff in this matter, NXIVM Corporation ("NXIVM"), filed a complaint against Mr. Ross in this District, docketed as 03-CV-976, arising from (i) his providing assistance to one family, the Suttons, whose children became involved with NIXVM, and (ii) Mr. Ross's publication of pointed criticisms of NIXVM on his website.  In February, 2006 the lawsuit was transferred to the District of New Jersey under the caption, *NXIVM v. the Ross Institute, et al.*, No. 06-cv-01051 ("hereinafter the "Ross Action" or "Ross lawsuit").

In November 2004, while the Ross Action was actively being litigated in this Court before Judge Sharpe, Plaintiff NXIVM and Interfor, a private investigation firm, concocted and carried out an elaborate scheme to contact Mr.Ross, the opposing party in the Ross Action, and subject him to extensive, *ex parte* and plainly improper and unethical extrajudicial discovery.  Plaintiffs assert that in the Fall of 2004, NXIVM's then-counsel of record, Nolan & Heller, recommended NXIVM's retention of Interfor to conduct that "investigation" of Ross in connection with the Ross lawsuit.  According to plaintiffs, Interfor

---

[1]   This Court on October 10, 2006 granted Ross permission to intervene for the limited purpose of addressing plaintiffs' application for a protective order in this case, and their motion to quash Ross's subpoena on Joseph O'Hara.  By counsel's October 3, 2006 letter to the Court (at 2), Ross had sought such limited intervention to ensure that any protective order entered here does not prejudice the ability of Magistrate Judge Falk in the Ross Action in the District of New Jersey properly to resolve motions and issues already pending before him.

worked under the direction of NXIVM and Joseph O'Hara, the defendant in the above-captioned case (hereinafter "the O'Hara matter"), who NXIVM alleges to have also been one of its attorneys. Accepting *arguendo* NXIVM's proposition that attorneys directed Interfor's actions, beginning in November 2004, NXIVM and its attorneys -- knowing that Ross was represented by counsel in the Ross Action -- directed Interfor to engage in a series of blatantly improper *ex parte* communications with Mr. Ross, in direct violation of rules of professional conduct and well outside the scope of protections afforded by the attorney-client privilege.

Together with Interfor, NXIVM concocted an elaborate subterfuge. Pretending to represent a concerned mother whose 27-year old daughter had become ensnared by NXIVM, Interfor solicited Ross -- who they knew to be a cult intervention specialist -- to assist the worried mother in attempting to disassociate her daughter from NXIVM. Interfor's president, former Israeli intelligence operative Juval Aviv, invited Mr. Ross to Interfor's offices, where Ross met with another Interfor associate, Anna Moody, before being introduced to distraught mom "Susan L. Zuckerman." But "Susan L. Zuckerman" was not a concerned mother; "Susan L. Zuckerman" had no daughter in NXIVM's clutches; and "Susan L. Zuckerman" was not Susan L. Zuckerman. She was an *actress* hired by Interfor and NXIVM. Indeed, had their charade proceeded as they hoped, NXIVM and Interfor contemplated offering up a key NXIVM insider, Kristin Keeffe -- whose Declaration ("Keefe Decl.") plaintiff's have placed before the Court as Exhibit R to the October 20, 2006 Declaration of Douglas C. Rennie ("Rennie Decl.") -- to portray Zuckerman's daughter, "Judy."

Under the guise of calling upon Mr. Ross to assist the make-believe "Susan" in extricating the make-believe "Judy" from NXIVM, Aviv, Moody, and the actress they had hired proceeded to question Mr. Ross intensely -- outside the presence of his attorneys and on two separate occasions, several months apart -- concerning everything Ross knew about NXIVM, its *de facto* leader, Keith ("Vanguard") Raniere, and its first lieutenant, Nancy ("Prefect") Salzman.

Thus, in effect, NXIVM -- through Interfor -- surreptitiously and extensively deposed Mr. Ross, without the consent or presence of his attorneys, both to learn everything he

knew about NXIVM and almost certainly to obtain admissions or other damaging statements that NXIVM could use improperly to gain leverage over Ross in this lawsuit. If attorneys -- whether Joseph O'Hara or others -- participated in directing Interfor's ruse, it is difficult to imagine a more egregious case of litigation misconduct. Yet, remarkably, this bizarre tale would take an even more sinister twist.

Interfor submitted a signed retainer agreement to Mr. Ross, and paid him $2,500 pursuant to that agreement. During the course of Interfor's mock, in-depth "job interview," Ross was asked to perform the would-be intervention with "Judy" on a cruise ship (which, at the time, did not seem terribly out of the ordinary to Mr. Ross, since he usually requests that such interventions be conducted as far away from the cult or group as possible). It also did not seem particularly unusual when Interfor's Ms. Moody informed him -- sometime in mid-2005 -- that "Ms. Zuckerman" had decided not to go forward with the intervention.

Flash forward to about five months ago when, in a stranger-than-fiction revelation, Ross received a message left on his answering machine by a newspaper reporter who was calling to confirm a story about a NXIVM plot to lure Mr. Ross onto a cruise ship. Even before returning the reporter's call and speaking with him, the message made Ross immediately realize that Interfor had been hired by NXIVM, and that the entire "Susan L. Zuckerman" episode had been an elaborate deception. In Ross's subsequent conversation with him, the reporter not only reiterated the "cruise ship plot" allegations, but read excerpts to Ross from an Interfor-generated report about Ross -- a copy of which was in the reporter's possession -- that contained detailed information about transactions in Ross's bank account.

Soon thereafter, counsel for Ross were able to verify NXIVM's hiring of Interfor from publicly-available court records. A privilege log filed in this Court by NXIVM in the O'Hara matter (in which the question of whether O'Hara served as NXIVM's attorney or merely as a "consultant" remains a contested issue), identifies as allegedly privileged a November 23, 2004 "Research Report on Rick Ross in connection with the Ross dispute" prepared by Interfor's Anna Moody. On this information, on July 11, 2006, counsel for Ross served subpoenas in the

New Jersey Ross Action on Interfor and its agents, Juval Aviv and Anna Moody.  On August 7, 2006, NXIVM filed a motion in the District of New Jersey to quash the Interfor subpoenas.  On November 1, 2006, Interfor belatedly filed its own motion to quash those subpoenas.  Both of those motions to quash present to Magistrate Judge Falk precisely the privilege and crime-fraud exception issues that NXIVM puts before this Court in its present motion to quash the O'Hara subpoena.[2]

Ross has indeed had contacts with O'Hara, but it was only *after* the July Interfor subpoenas had been served that Ross first received an unsolicited phone call from O'Hara, who told Ross unequivocally that he was never NXIVM's attorney.  Ross also learned from Mr. O'Hara:

- that O'Hara, "Prefect" Salzman and NXIVM legal liaison Kristin Keeffe all met with Interfor in connection with their investigation of Ross;

- that they and "Vanguard" Raniere were all aware of and/or directed Interfor's conduct;

- that Interfor had apparently bribed employees at Fleet Bank and one of Mr. Ross's phone providers to illegally obtain copies of his bank and telephone records, as well as the bank statements of Ross's roommate,[3]

---

[2]   NXIVM's August 7, 2006 New Jersey motion to quash is fully briefed as of November 17, 2006, upon NXIVM's filing of its reply.  The Interfor motion to quash will be fully briefed on December 8, 2006.

[3]   O'Hara knew that Interfor had *somehow* obtained Ross's bank and telephone records, and assumed, perhaps mistakenly, that it had done so through bribery rather than through "pretexting."  As has been widely reported in the press recently in connection with the Hewlitt-Packard board "leak" scandal, the practice known as "pretexting" is another common -- though unlawful -- technique employed by private investigators like Interfor. Remarkably, though both NXIVM and Interfor continue to squeal that the "bribery or pretexting" allegation is "scurrilous," despite repeated opportunities to do so -- including a sworn Declaration filed in the Ross Action by Interfor's President and CEO, Juval Aviv -- they have conspicuously failed to deny it.

- that Interfor had bribed someone either working at or residing in Ross's apartment building to sort through his garbage -- a box of which was sent to O'Hara by Interfor and remains in O'Hara's possession;

- that the "concerned mother" introduced to Ross by Interfor as "Susan L. Zuckerman" was indeed an actress hired by Interfor; and

- that the so-called cruise ship plot was, according to plaintiffs' sworn Declarant Kristen Keeffe, a plan to "convert" Mr. Ross -- though it remains unclear whether after luring Ross onto a cruise ship, NXIVM hoped to "convert" him into a NXIVM disciple, a victim of criminal assault, or worse. As statements now attributed by the press to Raniere's former live-in girlfriend and NXIVM insider Toni Natalie suggest (*see* Ross Decl., Ex. D),[4] the possibility that Raniere intended to inflict severe bodily harm upon Ross, or even to kill him, is not so far-fetched.

On October 6, 2006, counsel for Mr. Ross filed a motion in the Ross Action in New Jersey seeking to amend Ross's previous pleadings to assert Verified Counterclaims against NXIVM, Keith Raniere, Nancy Salzman, Kristin Keeffe, Interfor, Inc., Juval Aviv, Anna Moody, Jane Doe and John Does 1-10, for NXIVM's and Interfor's blatant scheme to gain illegal, ex parte discovery from Ross in the Ross litigation.[5]

Plaintiffs now bring to this Court a continuation of their efforts to conceal the details of their plot to undermine the adversarial and judicial processes in the Ross Action; they seek by the instant motion to encumber adjudication in the Ross Action -- by asking this Court to

---

[4]   A copy of the October 1, 2006 Declaration of Rick Ross ("Ross Decl."), submitted to the court in the Ross Action, is annexed to the accompanying November 17, 2006 Declaration of Peter L. Skolnik ("Skolnik November Decl.") as Exhibit B.

[5]   Counsel for Ross first served counsel for NXIVM with a copy of the proposed Counterclaims on August 24, 2006, and first sought informal leave to file them on August 30, 2006. Ross's formal motion to amend his pleadings to assert those Counterclaims is now fully briefed and awaiting decision by Magistrate Judge Falk.

both quash Ross's document and deposition subpoena to O'Hara, as well as to enter a protective order that might well interfere with other discovery that Magistrate Judge Falk is being asked to deem relevant, necessary and not protected by any asserted privilege.  In support of their motion plaintiffs now claim, as they have in their motion to quash in the Ross Action, that O'Hara's involvement in this illegal, tortious and unethical conduct somehow creates a "privilege" through which they can shield themselves and Interfor from having to reveal the incriminating details of conduct O'Hara quite clearly had in mind when he referred (in a 2005 letter to Prefect Salzman), to "activities that I believe to be illegal" and, in some cases, "*in my professional judgment, clear violations of a variety of civil and criminal statutes and regulations.*"[6]  It is the height of hypocrisy for NXIVM to seek the sanctuary afforded by the attorney-client privilege in order to conceal litigation misconduct that was largely designed to circumvent Mr. Ross's relationship with his attorneys, and to obtain unauthorized and improper discovery from Ross outside their presence.  It is particularly ironic that NXIVM now seeks to have this Court prohibit the discovery into this misconduct that Ross seeks from Mr. O'Hara -- while NXIVM and its attorneys have been prosecuting the underlying Ross litigation for almost two years with information improperly obtained from and about Mr. Ross through their elaborate subterfuge.[7]

**B.    Summary of Legal Argument**

There can be no dispute that NXIVM's and Interfor's scheme -- which plaintiffs acknowledge was "directed by O'Hara *and by NXIVM*" (Pl. Mem. at 7) -- was concocted directly and specifically for the purpose of affecting the Ross litigation in New Jersey.  All of the

---

[6]    An unredacted copy of O'Hara's March 11, 2005 letter to Salzman is annexed as Exhibit A to the October 1, 2006 Declaration of Peter L. Skolnik submitted in the Ross Action ("Skolnik October Decl."). The Skolnik October Declaration is in turn annexed to the Skolnik November Decl. as Ex. A.

[7]    Accordingly, plaintiffs' assertions (i) that Ross's efforts to redress his legitimate grievances about NXIVM's conduct constitute an "extraordinary *intrusion* . . . into how NXIVM litigated its case against him" and (ii) that "the only *victim* here is NXIVM" (Plaintiffs' October 20, 2006 Memorandum of Law ("Pl. Mem.") at 3, 39; emphasis added), are breathtaking.

deceptive and fraudulent conduct directed at Mr. Ross was intended to gain an improper advantage for NXVIM in that litigation.  In essence, NXIVM's current motion to quash in this Court is simply an end run around the authority of the district court in New Jersey.  Indeed, *NXIVM's own motion* to quash the Interfor subpoenas, *filed by NXIVM in New Jersey* and now fully briefed and pending adjudication by Magistrate Judge Falk in that court, directly addresses the very question of whether O'Hara's communications with regard to the Interfor "investigation" of Mr. Ross are subject to the crime-fraud exception to any attorney client or work-product privileges.

Consequently, Mr. Ross submits that the New Jersey court -- in which both NXIVM's previous motion to quash and the underlying Ross litigation that is at the heart of NXIVM and Interfor's illegal scheme are pending -- is in the best position, and is the most appropriate court, to resolve the crime-fraud and privilege issues.  Ross does not argue here -- and has not asked Magistrate Judge Falk to find -- that O'Hara was not NXIVM's attorney, notwithstanding that O'Hara told Ross he was not.  Rather, Ross's position accepts *arguendo* that O'Hara *was* NXIVM's attorney, but argues that the crime-fraud exception nevertheless overcomes any attorney-client or work product privilege with respect to the Interfor investigation.[8]  Indeed, under the similar law of either the Second or Third Circuits, and again assuming *arguendo* that O'Hara was acting as an attorney when he retained Interfor on NXIVM's behalf, there can be no serious question that the crime-fraud exception to the attorney-client and work product privileges applies fully here, and renders those privileges nugatory.

---

[8]   It is unnecessary for the New Jersey court to reach the contested question of whether O'Hara in fact was acting in the capacity of NXIVM's attorney.  Moreover, this question is subject to conflicting evidence not susceptible to resolution on a motion such as this or the one pending in New Jersey.  In any event, Ross also does not dispute that "this Court must have the ability to determine whether O'Hara performed legal work for NXIVM and whether he owed ethical duties to NXIVM in conjunction with that work."  Pl. Mem. at 27.  He seeks only to ensure that NXIVM's *ipse dixit* assertion that "Ross's rights will not be 'unduly prejudiced' in any way by rulings of this Court" (*id.* at 27-28) will actually be reflected in the eventual rulings on NXIVM's motion.

Nor does Ross argue that this Court should decline to enter any protective order imposing restrictions on O'Hara's future conduct.  Instead, Ross respectfully requests only that any such order not interfere with or otherwise provide a basis to object to such discovery, including deposition testimony from O'Hara, as Magistrate Judge Falk might deem appropriate - - and if necessary might compel -- in connection with Ross's prosecution of his Counterclaims in the Ross Action.

For the reasons set forth below, we respectfully request that this Court limit the restrictions contained in any protective order in a manner that will accommodate future discovery that Magistrate Judge Falk authorizes and/or compels in the Ross Action, and that this Court stay its consideration of the motion to quash the O'Hara subpoena in deference to the New Jersey trial court's resolution of the crime-fraud and privilege issues that await decision there. As noted below, deferring to a sister trial court in situations such as this is a frequent and well-accepted practice, and one that is well within the Court's discretion.

## COUNTER STATEMENT OF FACTS

A.    **Introduction.**

Since 1996, Rick Ross has operated a web site at www.rickross.com.  Ross Decl.(Skolnik November Decl. Ex. B) ¶2.  Plaintiff NXIVM is one of the hundreds of groups discussed there, and information about NXIVM is archived at the web site. *Id.*  There is little doubt that the sole purpose of NXIVM's ongoing lawsuit against Mr. Ross, now pending in New Jersey, is to interfere with Ross's constitutionally protected right to provide reports and other information about NXIVM to the public, to express opinions about it, and to provide a forum for the expression of opinions and the personal experiences of others. *Id.*

In addition to running www.rickross.com, and frequently serving in court as an expert witness on cult-related matters, Mr. Ross provides services as a cult intervention specialist, helping families who seek assistance in facilitating discussions with family members

who have become involved with cults and other controversial groups or movements.  Ross Decl. (Skolnik November Decl. Ex. B) ¶3.  Ross's work as a cult intervention specialist has taken him across the United States and Canada, and to Europe and the Middle East.  *Id.*  Such interventions typically involve helping a family concerned about a loved one who they believe has somehow become involved in a potentially unsafe group and/or situation -- most frequently with groups that can be considered "cults."  *Id.*

**B.      Interfor's *Ex Parte* Contacts with Defendant Rick Ross.**

In or about November 2004, while the Ross lawsuit was pending in this Court, Mr. Ross received a phone call from Interfor, a private investigation firm.  Soon thereafter, Mr. Ross spoke with Interfor's president, Juval Aviv.  Ross Decl. (Skolnik November Decl. Ex. B) ¶4.  According to Mr. Aviv, Interfor represented a woman whose 27-year old daughter was involved with NXIVM; when Interfor learned of Mr. Ross's experience with such matters, Aviv had recommended Ross to help the woman with her daughter.  *Id.*  Mr. Ross disclosed to Mr. Aviv that he was then involved in litigation with NXIVM, which had already been pending in this Court for over a year.  *Id.*

Mr. Ross agreed to meet with Interfor's client at its offices in New York City later in November 2004.  *Id.* ¶5.  There he met with Anna Moody, Mr. Aviv and the concerned mother, introduced to him as "Susan L. Zuckerman."  *Id.*  Mr. Aviv identified Ms. Zuckerman as his longtime family friend, and Mr. Ross was told that Ms. Zuckerman's daughter was involved with NXIVM. *Id.*  The story went that Zuckerman's daughter had sold family heirlooms to get money to give to NXIVM, and that Zuckerman's husband had to buy back the items from pawn shops.  *Id.*

Some five months later, Moody contacted Mr. Ross again, and on April 20, 2005, he again met with her and Ms. Zuckerman at Interfor's offices.  Ross Decl. (Skolnik November Decl. Ex. B) ¶6.  A relevant excerpt from Mr. Ross's phone log and a copy of taxi receipts Mr. Ross kept in his "Susan Zuckerman" file are attached to the Ross Declaration as Exhibits A & B.

Notably, the April 2005 meeting took place well after Mr. O'Hara had terminated his relationship with NXIVM -- whatever its nature -- as confirmed by O'Hara's March 11, 2005 termination letter.  *See* Skolnik October Decl. (Skolnik November Decl. Ex. A) Ex. A.  During the course of Mr. Ross's two meetings at Interfor's offices with Mr. Aviv, Ms. Moody and Ms. Zuckerman, Ross was interviewed concerning everything he knew about NXIVM, and about how he might go about helping Ms. Zuckerman with her daughter.  Ross Decl. (Skolnik November Decl. Ex. B) ¶6.  When Mr. Ross advised them that it is generally best to conduct an intervention as far away as possible from the cult or group, it was suggested by one of the others that the intervention be conducted on a cruise ship.  *Id.*

After Mr. Ross's first meeting at Interfor, he furnished its representatives with a retainer agreement, which was promptly signed by "Susan L. Zuckerman," "c/o Interfor."  Ross Decl. (Skolnik November Decl. Ex. B) ¶6.  The original signed retainer agreement was returned to Mr. Ross, and a copy of that agreement is annexed to the Ross Declaration (Skolnik November Decl. Ex. B) as Exhibit C.  Interfor also furnished Mr. Ross with check for $2,500.00 as a retainer for his services to be performed on behalf of Ms. Zuckerman.  *Id.* ¶6.  Ultimately, Mr. Ross was advised by Ms. Moody that Ms. Zuckerman did not wish to go forward with the intervention.

Right before the July 4th holiday, 2006, Mr. Ross received a telephone message from Chet Hardin, a newspaper reporter at a free weekly Albany-based newspaper called *Metroland*, who said that he wanted to confirm a story about a NXIVM plot to lure Mr. Ross onto a cruise ship.  Ross Decl. (Skolnik November Decl. Ex. B) ¶9.  It was only from this message -- received more than a year-and-a-half after Ross first met with Interfor -- that he realized both that NXIVM had hired Interfor, and that their stated purpose for meeting with him was all an elaborate charade.  *Id.*

Reflecting upon this new information, it became clear to Ross that the purpose of Interfor's meetings with him was, in effect, to depose him without the permission or presence of his attorneys, Douglas Brooks and Thomas Gleason -- who were then representing Ross in the

Ross Action while it was venued in this District (and who have continued to do so following transfer, along with lawyers from Lowenstein Sandler).  Ross Decl. (Skolnik November Decl. Ex. B) ¶10.  To the best of his present recollection about the meetings with Interfor, Ross was asked to reveal:

  a.  Everything he knew about NXIVM, its programs, "Vanguard" Raniere and "Prefect" Salzman;

  b.  Whom he had been in touch with regarding NXIVM and the nature and details of his experience with the organization;

  c.  Why he considered NXIVM destructive;

  d.  What, specifically, he understood NXIVM to do that might damage people;

  e.  The number of complaints he had received about NXIVM and the nature of those complaints;

  f.  How he viewed Raniere's and Salzman's role in the group;

  g.  How NXIVM "brainwashes" people;

  h.  What NXIVM teaches, per his understanding of its programs;

  i.  What intervention clients had retained Ross who were concerned about NXIVM;

  j.  The details of his work history with those NXIVM-related clients;

  k.  The number of interventions he had performed during his career;

  l.  The step-by-step details of how he performs an intervention;

  m.  His success rate in performing interventions;

  n.  How he would handle a NXIVM case, as opposed to one concerning another group; and

  o.  How he would handle the Zuckerman case.

In seeking Ross's answers to these several questions, NXIVM and Interfor were clearly attempting improperly to obtain information, admissions and statements that NXIVM could use to obtain leverage or advantage in the Ross Action.

**C.      The Press Contacts Ross, and His Attorneys Serve Subpoenas on Interfor.**

After the July 4th holiday, Ross had an opportunity to speak by phone with Chet Hardin, the reporter from *Metroland* who had previously contacted him.  Hardin explained that he was working on a story that involved NXIVM hiring Interfor to investigate Ross and lure him onto a cruise ship.  According to Hardin, his source for this piece of the story was O'Hara.

Hardin's article was subsequently published on August 10, 2006, and is attached to the Ross Declaration (Skolnik November Decl. Ex. B) as Ex D.  During Hardin's discussion with Ross, he read to Ross from a report that had been written for NXIVM by Interfor, which established unequivocally that Interfor and NXIVM had illegally obtained Ross's bank records.  Interfor's report contains detailed information about deposits, withdrawals and checks drawn from Ross's personal checking account during 2004.[9]

On July 5, 2006 this firm obtained, from the PACER system for this District, a privilege log that NXIVM had filed with the Court on April 7, 2006 in its litigation against Mr. O'Hara.  A copy is attached to the Skolnik October Declaration (Skolnik November Decl. Ex. A) as Exhibit B.  The privilege log identifies a memorandum generated by Interfor for NXIVM, entitled "Interfor, Inc. Status Report Rick Ross November 2004."  This privilege log entry, which identifies a report generated around the precise time that Interfor was engaged in its improper *ex parte* contacts with Ross, provided unequivocal proof that NXIVM had hired Interfor.  A copy of the Interfor November 2004 "Status Report" is annexed to the October 1, 2006 Supplemental Declaration of Rick Ross ("Supp. Ross. Decl.") (Skolnik November Decl. Ex. C) as Exhibit A.  Based upon the information Ross had obtained from Mr. Hardin and from NXIVM's publicly-available privilege log, this firm caused Interfor, Juval Aviv and Anna Moody to be served with subpoenas on July 11, 2006, demanding that they produce documents and provide testimony in the Ross Action.

**D.      O'Hara Contacts Ross.**

Mr. Ross did not first speak with Joseph O'Hara until the following evening, July 12, 2006, when Ross received an unsolicited phone call from O'Hara.  Ross Decl. (Skolnik

---

[9]     Stunningly, Interfor's submission on its own Motion to Quash urges that the report only identifies four deposits and ten debits -- as if this makes its conduct hardly worth complaining about.

November Decl. Ex. B) ¶12.  During that phone call, and another O'Hara made to Ross the following week,[10] O'Hara advised Ross, *inter alia*, of the following:

- That O'Hara was never NXIVM's lawyer.

- That O'Hara, Salzman and NXIVM legal liaison Kristin Keeffe all met with Interfor in connection with that its investigation of Ross, and that they and Vanguard Raniere were all aware of and/or directed Interfor's conduct;

- That Interfor had apparently bribed employees of Fleet Bank and one of Ross's phone providers, to illegally obtain copies of his bank and telephone statements, respectively;[11]

- That Interfor bribed someone who worked at, or resided in, Ross's apartment building to sort through his garbage; and that Mr. O'Hara is, in fact, still in possession of a box sent to him by Interfor that contains Ross's garbage; and

- That the "concerned mother" introduced to Ross by Interfor as "Susan L. Zuckerman" was an actress hired by Interfor.

Ross Decl. (Skolnik November Decl. Ex. B) ¶13.

According to O'Hara: "Vanguard," "Prefect" and Keeffe had begun to plot with Interfor to lure Mr. Ross onto a cruise ship for purposes that remain vague.  Ross Decl. (Skolnik November Decl. Ex. B) ¶14.  O'Hara told Ross that they had also discussed having Keeffe portray "Judy," the daughter of "Susan L. Zuckerman."  *Id.*  According to O'Hara, Keeffe, who O'Hara believes to have been brainwashed by Raniere and Salzman, told him that the bizarre plan to lure Ross onto the cruise ship was to "convert" Ross.  *Id.*  While it remains unclear what exactly Ms. Keeffe might have understood Raniere and Salzman to mean by "convert," it takes less imagination to envision what it is that "Vanguard" and "Prefect" actually wanted to do to Mr. Ross -- whose lawful activities they perceive as a grave danger to their NXIVM racket -- once Ross was isolated on a cruise ship.  Indeed, the press has reported and O'Hara has

---

[10]   After the second phone call, Mr. O'Hara made one or two additional phone calls to Mr. Ross in the weeks that would follow.  As of this date, Mr. Ross has not heard from Mr. O'Hara in over two months.  *See* Supp. Ross. Decl. (Skolnik November Decl. Ex.C) ¶ 4.

[11]   *See* n.3, *supra*.

confirmed that he received a death threat spray-painted on his property after he began speaking out publicly against NXIVM; and Toni Natalie, a former NXIVM insider who was Raniere's live-in girlfriend has referred to Raniere and Salzman as "very, very dangerous, scary people," and has maintained that in Raniere's view, "If you had to kill somebody, and it is for the betterment of the Family [of NXIVM's inner circle], it would be OK."   Ross Decl. (Skolnik November Decl. Ex. B), Ex. D.

During one or both of his meetings at Interfor's offices, Ross explained to the Interfor Defendants that he never works alone with the subject of a cult intervention, and that both "Zuckerman" and Juval Aviv would have to be present at all times during the "Judy" intervention.  Ross Decl. (Skolnik November Decl. Ex. B) ¶15.  Moody appeared disappointed when Ross took this position, and she ultimately advised Ross that "Ms. Zuckerman" had decided not to go forward with the intervention.  *Id.*

O'Hara told Ross that it was at about the time that this cruise ship plot was being concocted that O'Hara came to conclude that he could no longer be a willing participant in NXIVM's conduct.  Ross Decl. (Skolnik November Decl. Ex. B) ¶14.  Interestingly, O'Hara terminated his relationship with NXIVM sometime in early February 2005, as he stated in his formal termination letter addressed to Salzman on March 11, 2005.  Skolnik October Decl. (Skolnik November Decl. Ex. A), Ex. A.[12]  In his letter to Salzman, O'Hara states that he:

> became aware of -- and informed you about -- a variety of activities that I believe to be illegal (*Note: Although some of those activities admittedly involved 'gray areas' of the law, others involved, in my professional judgment, clear violations of a variety of civil and criminal statutes and regulations*).   Notwithstanding my advice to the contrary, you, your various companies and various   individuals   associated   with   those   companies   have

---

[12]   A redacted version of that letter is attached to the Keeffe Declaration (Rennie Decl. Ex. R) as Exhibit B.  Presumably, counsel for NXIVM redacted the letter in an ill-conceived attempt to hide from the New Jersey court Mr. O'Hara's written explanation for terminating his relationship with NXIVM.  NXIVM's counsel apparently forgot that the unredacted letter had previously been placed in the public record, where they themselves had filed it as an exhibit to a March 26, 2006 letter to this Court in the O'Hara matter.

> continued to engage in those activities -- and, in several instances,
> have even expanded same.

Emphasis in original.[13]

 After O'Hara spoke with Ross, he faxed Ross a report created by Interfor -- apparently the same report described to Ross by reporter Hardin, and apparently the same report identified in NXIVM's privilege log filed in this Court (Skolnik October Declaration (Skolnik November Decl. Ex. A), Ex. B).  The report (Supp. Ross. Decl. (Skolnik November Decl. Ex.C) Ex,. A), which is filled with scurrilous and largely inaccurate information about Mr. Ross, contains information taken not only from Mr. Ross's personal bank and telephone records, but further contains information from the bank records of Ross's roommate, who has nothing to do with Ross's work or with the Ross litigation.  The report -- and the investigation upon which it is based -- represents an outrageous intrusion into Mr. Ross's personal privacy.[14]

 The report reveals no mental impressions or strategy of counsel; its only relevance to the Ross Action is as evidence supporting Mr. Ross's Counterclaims in that lawsuit. Moreover, since we know of no legal means by which Interfor could have obtained Ross's bank or telephone records -- and neither NXIVM nor Interfor has denied the bribery-or-pretexting allegation -- the report is also almost certainly evidence of criminal activity.

---

[13]  *See also* O'Hara's August 15, 2005 letter to Richard L. Mays, Esq., which plaintiffs also placed on the public record in the O'Hara matter.  A copy of that letter is attached to the Skolnik October Decl. (Skolnik November Decl. Ex. A) as Exhibit C.

[14]  We note in passing that the Interfor report is addressed to O'Hara at his Albany-based *consulting* firm, "The O'Hara Group & Associates, *LLC*," not to his Washington D.C.-based *law* firm, "The O'Hara Group & Associates, *PLLC*."   Moreover, facts of record certainly raise the question of whether O'Hara's formation of a Washington D.C. law firm -- which he claims was done at the request of Raniere and Salzman (*see* Affidavit of Joseph O'Hara (attached to the Skolnik October Decl. (Skolnik November Decl. Ex. A) as Ex D, at ¶ 10) -- was simply a fraudulent attempt to shroud unlawful and unethical conduct, such as Interfor's investigation of Ross, with the camouflage of the attorney-client privilege.

## **ARGUMENT**

I.   **THIS COURT SHOULD STAY ITS DECISION ON NXIVM'S MOTION TO QUASH, AND DEFER TO THE ADJUDICATION OF THE CRIME-FRAUD AND PRIVILEGE ISSUES BY THE COURT IN THE DISTRICT OF NEW JERSEY HEARING THE UNDERLYING *NXIVM V. ROSS* ACTION**

The District Court for the District of New Jersey is in the best position to determine the true nature of the NXIVM-Interfor plot and the applicability of the crime-fraud exception to any NXIVM claims of attorney client or work product privilege.  In the interests of fairness and judicial economy, Ross respectfully requests that this court stay its consideration of NXIVM's motion to quash the O'Hara subpoena pending decision on those matters by Magistrate Judge Falk in New Jersey.[15]  The New Jersey court has already been asked to consider motions *brought there by NXIVM and Interfor* that directly address the question of whether O'Hara's involvement in the elaborate and fraudulent Interfor subterfuge invokes the crime/fraud exception to any claims of privilege.  Plaintiffs should not be permitted to interfere with Magistrate Judge Falk's adjudication of those motion -- one of which (NXIVM's) was filed more than three months ago in early August 2006.  Similarly, we respectfully request that NXIVM's request here to silence O'Hara not be permitted to impede the New Jersey court's resolution of the crime/fraud issue or any subsequent rulings the New Jersey court deems appropriate with respect to full discovery into the NXIVM/Interfor/O'Hara conduct in the Ross Action.[16]  We note that NXIVM has now implicitly conceded that O'Hara's counsel should be

---

[15]   As noted below, there also is support for this Court to formally transfer the motion to quash to the New Jersey court.  While Ross would certainly not oppose such transfer, he suggests it is unnecessary; deferring to the New Jersey court's adjudication of the privilege and crime-fraud issues will place the matter in the hands of the best situated Court -- the one overseeing the lawsuit in which the fraudulent conduct at issue arose -- and will preserve fairness and judicial economy, and avoid the potential for inconsistent resolutions of the questions at issue.

[16]   As plaintiffs concede, the party seeking a protective order has the burden of showing that "good cause" exists for its issuance (Pl. Mem. at 17), and they accept that even where the movant "establishes good cause for protection, the court may balance the countervailing interests to determine whether to exercise discretion and grant the order."  *Id.* (quoting *Hasbrouck v. BankAmerica Hous. Servs.*, 187 F.R.D. 453, 455 (N.D.N.Y. 1999)).  That

permitted to retain copies of all documents called for by the subpoena to him. *See* Pl. Mem. at 2-3. Indeed, it is vital that any order issued by this Court not place the only copies of relevant documents solely under NXIVM's control.[17]

To be sure, under *Fed. R. Civ. P. 45*, motions to quash, modify, or condition a subpoena ordinarily are directed to the district court for the district in which the subpoena issued (hereinafter "the issuing court"). The issuing court has the necessary jurisdiction over the party issuing the subpoena and the person served with it to enforce the subpoena. *See* Fed. R. Civ. P. 45(c)(3)(A). However Rule 45 is "not intended to diminish rights conferred by Rules 26-37 or any other authority." Fed. R. Civ. P. 45, Advisory Committee Notes, 1991 Amendment, Subdivision (c). Numerous courts, in the interests of fairness and judicial economy, have applied to subpoenas under Rule 45 some of the general provisions relating to discovery power. In particular, issuing courts previously have determined that motions regarding a subpoena would be better addressed and adjudicated in the court where the underlying action is pending.

Some courts have held that the issuing court may "transfer" the motion to the district court in which that underlying action is pending. *See, e.g.*, *In re Digital Equipment Corp.*, 949 F.2d 228, 231 (8th Cir. 1991) (in the context of Rule 45 deposition and document subpoenas, "while the [issuing] court initially has exclusive jurisdiction to rule on the objections, it may in its discretion remit the matter to the court in which the action is pending"); *Petersen v. Douglas County Bank & Trust Co.*, 940 F.2d 1389, 1391 (10th Cir. 1991) (in the context of a motion to quash a subpoena for deposition and documents, even without the consent of the non-party subpoena recipient to the transfer of the motion to the district where the main litigation was pending, "the transfer was not improper simply because the transferred matter involved a motion

_____

discretion extends as well to molding the contours of any protective order the Court may enter.

[17]    Ross respectfully suggests that documents left in the hands of O'Hara's attorneys must be deemed to be under O'Hara's control for purposes of his compliance with any ultimate enforcement of the subpoena, and he respectfully requests that any protective order this Court enters should reflect that understanding.

to quash under Rule 45"); *Schneider National Bulk Carriers v. Health And Welfare Fund*, 918 F. Supp. 272, 273 (E.D. Wis. 1996) ("in the interest of uniformity and judicial economy, it [was] appropriate to transfer [the] case to [the court] presiding over the litigation," even over the objection of the non-party witnesses); *Pactel Personal Communications v. JMB Reality Corp.*, 133 F.R.D. 137 (E.D. Mo. 1990) (nothing in 26(c) prohibits transfer, particularly when subpoenaed non-parties to the action seek the transfer).

Formal transfer of motions to quash or compel has been criticized by some courts. A number of courts facing the issue have instead endorsed the practice of the issuing court staying proceedings on a motion and deferring to the resolution of the underlying issues by the district court in which the underlying action is pending.  For example, in *In re Orthopedic Bone Screw Products Liability Litigation*, 79 F.3d 46, 48 (7th Cir. 1996), Judge Easterbrook reviewed subpoenas for third-party depositions from district courts in Wisconsin that had been issued by a party in various product-liability cases consolidated for pretrial proceedings in the Eastern District of Pennsylvania.  The subpoena recipients sought protective orders, the Wisconsin judges transferred the motion to the Eastern District of Pennsylvania for decision, and the recipients sought mandamus, contending that they had a right to a decision in their home jurisdiction.  The court first concluded that "[i]t is not clear to us that any provision in the Judicial Code or the Rules of Civil Procedure allows a district judge to transfer a particular motion for decision elsewhere." *Id.* at 48.  However, the court then described the issue as an "error of nomenclature, which we think these 'transfers' to be.  The Eastern District of Pennsylvania is authorized [under 28 U.S.C. § 1407(b) in coordinated or consolidated pretrial proceedings] to act on the motions for protective orders, and the district judges in Wisconsin are free to stay local proceedings and then to abide by the decision of the district court in Pennsylvania."  But the court goes on, beyond the 1407(b) context, to quote from Rule 26(c) that "*the court in which the action is pending* or alternatively, on matters relating to a deposition, the court in the district where the deposition is to be taken may make any order which justice requires . . . ," and then observes that "[t]hese actions are 'pending' before [the Pennsylvania

Judge].   The district judges in Wisconsin could grant or deny protective orders under the 'alternatively' phrase immediately following the italicized language, but they also possess discretion to defer to the judge handling the case on the merits."

Similarly, in *In re Sealed Case*, 141 F.3d 337, 342 (D.C. Cir.1998), the DC Circuit engaged in a careful reading of the text of Rule 45 and concluded that it did not authorize the formal transfer of a motion to quash." *Id.* at 341.   But the court then conducted its own "nomenclature" analysis, noting that:

> the [Rule 26(c)] Advisory Committee Note is . . . naturally read to suggest that the court for the district where the deposition is to be taken may stay its action on the motion, permit the deponent to make a motion for a protective order in the court where the trial is to take place, and then defer to the trial court's decision.   Rule 26(c) permits that court to stay its proceedings on a nonparty deponent's motion for a protective order pending action by the trial court, and to defer to the trial court's resolution of that motion. The rules may well allow similar abstention on a motion to quash, followed by deference to the trial court's decision on a motion for a protective order.

*Id.* at 342-43.

The Second Circuit has not addressed this question, but a number of district court decisions are instructive.   For example, *LaClede Professional Products, Inc. v. Sultan Dental Products Ltd.*, 1999 WL 92545 (S.D.N.Y. 1999), involved facts directly analogous to those in the instant case.   The defendant, not the recipient of the subpoena, moved in the issuing court, the Southern District of New York, to quash a subpoena directed to its attorney.   The New York court transferred the motion to the Central District of California, citing Fed. R. Civ. P. 26(c) and *In re Orthopedic Bone Screw*, 79 F.3d at 48.   *LaClede*, 1999 WL 92545 at *1-2.   In doing so, the New York court discussed the specific factors that led it to the conclusion that the trial court was better suited to decide the issues raised by the motion (*see infra*).   *Id.* at *2-3.

In *Devlin v. Transportation Communications International Union*, 2000 WL 249286 (S.D.N.Y. 2000), the trial court noted that the D.C. issuing court "determined that it would be most efficient if [the New York] Court ruled on the propriety of the subpoenas." 2000 WL 249286, at *1.   Following *In re Sealed Case*, the D.C. court had "stayed the motions

-19-

pending before him in anticipation of" the New York court ruling.  *Id.* (citing *In re: Sealed Case*, 141 F.3d at 342).  The New York court not only concluded that this procedure was acceptable, but went further to suggest that such a "procedural minuet" was probably unnecessary, as "[t]here is substantial support in the caselaw, among the commentators, and in the Advisory Committee Note to Rule 26(c) of the Federal Rules of Civil Procedure for the proposition that the court from which a subpoena has issued has the authority to transfer any motion to quash or for a protective order to the court in which the action is pending."  *Id.* (citing *In re Digital Equipment Corp.*, 949 F.2d at 231).[18]

The current motion by NXIVM to quash Ross's subpoena to O'Hara -- a subpoena directed entirely at discovering the full nature and extent of NXIVM's attempt to subvert the underlying Ross litigation -- presents a situation quite analogous to that before the Southern District court in *LaClede*, 1999 WL 92545.  In *LaClede*, in determining that the trial court was better suited to adjudicate the issues in the motion, the issuing court considered several factors, among them:

- That because the subpoena was directed at opposing counsel in the underlying litigation, "[h]owever the motions are decided, the determination of them will probably have a significant effect on [that] litigation."  *Id.* at *2.

  o In the Ross Action, the O'Hara subpoena seeks evidence of NXIVM's scheme, concocted and carried out in conjunction with someone NXIVM claims was its attorney, to circumvent the legal discovery process and fraudulently gain

---

[18]  Two other courts in the Southern District of New York have found that they lacked the authority to *transfer* motions regarding subpoenas, but did not proceed further to consider the propriety of staying their ruling on such motions and deferring to the court in the underlying matter.  *See In re Application for Order Quashing Deposition Subpoenas, dated July 16, 2002*, No. M8-85, 2002 WL 1870084. at *6 (S.D.N.Y. Aug. 14, 2002) (while the court where the litigation was taking place would be better placed to supervise the pretrial proceedings, it was not possible to "transfer the instant motion to quash") (citing *In re: Sealed Case*, 141 F.3d at 341); *In re Application of FB Foods, Inc.*, 2005 WL 2875366 (S.D.N.Y 2005) (declining to "remit the motion to [the trial court], based on an apparent understanding of "remit" to mean "transfer") (also citing *In re: Sealed Case*, 141 F.3d at 342).

extensive, improper discovery from Mr. Ross, a party in that litigation. As in *LaClede*, it will no doubt have a "significant effect" on that litigation. Moreover, plaintiffs already have brought a motion in New Jersey that raises precisely the same crime/fraud exception and privilege issues as the instant motion, and the New Jersey motion is now fully briefed and awaiting resolution.

- That if the subpoena was enforced, the deposition of the party's attorney, "may well lead to issues at the deposition as to whether particular questions are permissible or not and/or issues of attorney-client privilege or work product." *Id.*

  o Here, given the intricacies of the underlying litigation and the integral nature of NXIVM's misconduct in its pursuit of that litigation, the New Jersey court is best placed to decide how the crime/fraud exception should impact any privilege that might otherwise apply at O'Hara's deposition.

- Perhaps most significantly, that the motions in *LaClede* were "unlike the usual sort of motions considered under Rule 26(c) in a district other than that in which the motion is pending: this is not a case of a non-party witness seeking to quash a subpoena, but rather one in which counsel for defendants and defendants themselves seek to avoid the deposition." *Id.* at *3.

  o Here, it is NXIVM, a party in the New Jersey action, rather than O'Hara, the subpoena recipient, that seeks to stymie the discovery of facts that will show serious misconduct by NXIVM in the very conduct of that litigation. O'Hara has made no attempt to quash the subpoena or to avoid a deposition.

Considering all these factors, it is difficult to conceive of a situation where it would be more appropriate, not to mention more important for the proper administration of justice, for the court in the underlying action to resolve questions relating directly to the appropriateness of the O'Hara subpoena -- where that subpoena is directed at exposing conduct that had as its sole purpose and intent the subversion of the adversarial process in that underlying litigation.   Moreover, NXIVM concedes that "O'Hara is the only likely source with

-21-

knowledge . . . who is available to the defendants in the Ross Action." Pl. Mem. at 17.  For these reasons, this Court should stay its consideration of NXIVM's motion to quash, and defer to the ruling of the New Jersey court on the issue of the applicability of the crime/fraud exception to any claims of privilege.  It is *that* issue -- rather than "the propriety of O'Hara's campaign" (Pl. Mem. at 28) -- which has been placed before Magistrate Judge Falk in the court that is "better suited" to decide it.[19]

In any event, even if this court, in its discretion, chooses to resolve NXIVM'S motion to quash the O'Hara subpoena rather than transfer it or stay the matter and defer to the decision of Magistrate Judge Falk in New Jersey, NXIVM's motion to quash should be denied.

## II.   COMMUNICATIONS AND DOCUMENTS RELATED TO INTERFOR'S "INVESTIGATION" OF RICK ROSS ARE NOT PRIVILEGED; THEY ARE DISCOVERABLE.

### A.   Interfor's Investigation of Rick Ross is Subject to the Crime-Fraud Exception to the Attorney-Client and Work Product Privileges.

While Ross submits that this issue should be resolved by Judge Falk, it is important to note that the outcome would be the same whether Second or Third Circuit law is applied.  Under the law of either the Second or Third Circuits, NXIVM's and Interfor's scheme to obtain improper discovery from Ross invokes the crime/fraud exception to the attorney client or work-product privileges.  The central concern of the attorney-client privilege is "to encourage full and frank communication between attorneys and their clients and thereby *promote broader public interests in the observance of law and administration of justice*."  *U.S. v. Zolin*, 491 U.S. 554, 562 (1989) (emphasis added).  The privilege is designed "to enable the attorneys to provide

---

[19]    It is nonsense to say, though plaintiffs say it, that the information sought by the subpoena to O'Hara "is wholly irrelevant to the Ross Action." Pl. Mem. at 29.  In any event, it is surely for the court in that Action to decide what is and is not relevant.  Equally hollow is the analogous assertion that Ross does not *need* the information because "[t]here are no pending claims to which the information is at all relevant."  Pl. Mem. at 33.  As NXIVM is keenly aware, Ross's motion to assert his Counterclaims is now fully briefed and pending in New Jersey, where NXIVM has also advanced the very argument it makes here but that will be decided there -- that those Counterclaims are subject to dismissal because they are based on O'Hara's revelations.  Pl. Mem. at 34.

sound legal advice." *In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d

1032, 1036 (2d Cir. 1984).  But as the Second Circuit has stated:

> Whereas confidentiality of communications and work product
> facilitates the rendering of sound legal advice, advice in furtherance
> of a fraudulent or unlawful goal cannot be considered "sound."
> Rather advice in furtherance of such goals is socially perverse, and
> the client's communications seeking such advice are not worthy of
> protection.

*Id*. at 1038.

Thus, "[i]t is well-established that communications that otherwise would be protected by the

attorney-client privilege or the attorney work product privilege are not protected if they relate to

client communications in furtherance of contemplated or ongoing criminal or fraudulent

conduct."  *Id*.  It also is clear that the exception applies to the work product privilege.  *See, e.g.,*

*In re Grand Jury Proceedings,* 604 F.2d 798, 802 (3d Cir. 1979), (crime-fraud exception applies

not only to the attorney-client privilege, but the work product doctrine as well, since the work

product privilege would be "perverted if it is used to further illegal activity").

The standard is similar in the Third Circuit.  The attorney-client privilege "is

designed to encourage clients to make full disclosure of facts to counsel so that he may *properly,*

*competently, and ethically carry out his representation*."  *In re Grand Jury Proceedings,* 604 at

802 (emphasis added).  The "ultimate aim" of the privilege "is to promote the proper

administration of justice."  *Id*.  But the Third Circuit, too, has cautioned:

> That end, however, would be frustrated if the client used the
> lawyer's services *to further a continuing crime or tort*.  Thus, when
> the lawyer is consulted, not with respect to past wrongdoing but to
> future illegal activities, the privilege is no longer defensible and the
> crime-fraud exception comes into play.

*Id.* (emphasis added).

Furthermore, the "crime/fraud exception requires the disclosure of otherwise

privileged communications or material obtained in the course of the attorney's duties on the

client's behalf which are made or performed in furtherance of a crime, fraud, *or other*

*misconduct fundamentally inconsistent with basic premises of the adversary system." Gutter v. E.I. Dupont De Nemours*, 124 F.Supp.2d 1291, 1298 (S.D. Fla. 2000) (emphasis added); *accord Coleman v. American Broadcasting Cos.*, 106 F.R.D. 201, 208 (D.D.C. 1982). *See also State of N.Y. v. Solvent Chemical Co., Inc.*, 166 F.R.D. 284, (W.D.N.Y. 1996) ("The [work product] rule is intended to protect the privacy of litigants and their representatives only insofar as their conduct does not erode the integrity of the adversary process"); *Ward v. Maritz, Inc.*, 156 F.R.D. 592, 594 (D.N.J. 1994) ("Protection [of the work product doctrine] may be vitiated by the unprofessional or unethical behavior of an attorney or a party"); *Fellerman v. Bradley*, 99 N.J. 493, 503 (1985) (where a client seeks the assistance of an attorney "for the purpose of committing a fraud, a communication in furtherance of that design is not privileged").

Indeed, "District courts in [the Second] circuit have long construed the [crime/fraud] exception as reaching some conduct beyond crime and fraud." *Madanes v. Madanes*, 199 F.R.D. 135, 149 (S.D.N.Y. 2001). That is true of the sort of tortious conduct alleged by Ross in his Counterclaims. *See Sackman v. Liggett Group, Inc.*, 173 F.R.D. 358, 364 (E.D.N.Y. 1997) (quoting *Cooksey v. Hilton International Co.*, 863 F.Supp. 150, 151 (S.D.N.Y. 1994)) ("intentional torts moored in fraud"); *Rattner v. Netburn*, 1989 WL 223059, at *47 (S.D.N.Y. Jun. 20, 1989) (intentional torts); *In re Heuwetter*, 584 F.Supp. 119, 127 (S.D.N.Y. 1984) (torts); *Irving Trust Co. v. Gomez*, 100 F.R.D. 273, 276 (S.D.N.Y. 1983) ("intentional or reckless tortious behavior"); *Diamond v. Stratton*, 95 F.R.D. 503, 505 (S.D.N.Y. 1982) (intentional tort). As the *Madanes* court further explained, "[a]t a minimum, then, the attorney-client privilege does not protect communications in furtherance of an intentional tort that undermines the adversary system itself." *Madanes*, 199 F.R.D at 149.

In New Jersey, the crime-fraud exception encompasses "virtually all kinds of deception and deceit, even though they might not otherwise warrant criminal or civil sanctions." *Ocean Spray Cranberries, Inc. v. Holt Cargo Systems, Inc.*, 345 N.J. Super 515 521-22 (Law Div. 2000). As the *Ocean Spray* court further explained, "fraud" is not limited to "conventional notions of tortious frauds," but rather:

> Acts constituting fraud are as broad and varied as the human mind
> can invent. *Deception and deceit in any form universally connote
> fraud . . .* In summary, the "fraud" exception is to be given the
> broadest interpretation.

*Id.* at 522 (emphasis in original); *see also Id.* at 522 ("the 'fraud' exception is interpreted broadly

to include, *e.g.*, '[c]onfederating with clients to allow court and [opposing] counsel to labor

under a misapprehension as to the true state of affairs'").

To invoke the crime-fraud exception, the party opposing the privilege must

propose a factual basis that "strike[s] 'a prudent person' as constituting 'a reasonable basis to

suspect the perpetration or attempted perpetration of a crime or fraud, and that the

communications were in furtherance thereof.'" *United States v. Jacobs*, 117 F.3d 82, 87 (2d Cir.

1997) (quoting *In re John Doe*, *Inc.*, 13 F.3d 633, 637 (2d Cir. 1994)). Once this showing is

made, "the decision whether to engage in an *in camera* review of the evidence lies in the

discretion of the district court." *Jacobs*, 117 F.3d at 87 (quoting *Zolin,* 491 U.S. at 572 ). After

any *in camera* review, "the district court exercises its discretion again to determine whether the

facts are such that the exception applies." *Jacobs*, 117 F.3d at 87. As the evidence here

demonstrates, the Interfor investigation is so embroiled in fraud, deception, crimes and

misconduct that Interfor's communications concerning Ross with NXIVM and its alleged

attorney, O'Hara, fall squarely within the crime-fraud exception to the attorney-client and work

product privileges.

### 1. If Attorneys Supervised the Interfor Investigation, They Violated the Rules of Professional Conduct.

NXIVM alleges that while this matter was pending in this Court its then-trial

counsel, Nolan & Heller, recommended that NXIVM retain Interfor, and that O'Hara, NXIVM's

putative attorney, oversaw the Interfor investigation. If this is so, the attorneys' authorization of

Interfor's interrogation of Ross unequivocally violated the Disciplinary Rules of the New York

Lawyer's Code of Professional Responsibility. Disciplinary Rule 7-104 provides:

> A. During the course of the representation of a client a lawyer shall not:
>
> 1. Communicate *or cause another to communicate* on the subject of the representation with a party the lawyer knows to be represented by a lawyer in that matter unless the lawyer has the prior consent of the lawyer representing such other party or is authorized by law to do so.

*Id.* (emphasis added); *accord* Model Rule 4.2.  Here, NXIVM's lawyers unquestionably (i) caused Interfor "to communicate on the subject of the representation with Ross, (ii) knew that Ross was represented by a lawyer in the matter, and (iii) did so without the consent of Ross's lawyers or authorization by law.

As one Federal Court recognized, this rule "serves several vital ends." *Papanicolaou v. Chase Manhattan Bank, N.A.*, 720 F. Supp. 1080, 1084 (S.D.N.Y. 1989).  The Court elaborated:

> It guarantees fairness in the adversarial system.  It prevents unprincipled attorneys from exploiting the disparity in legal skills between attorney and laypeople.  It preserves the integrity of the attorney-client relationship.  The Rule also protects []opposing lawyers as well as opposing parties. . . .  The obvious reason is fear that the client will damage his case by making unwise voluntary statements. . . .  Another reason is fear that the lawyer's own tactics will be compromised, and that his own reputation will suffer as a result.  *Id.*

The Western District of New York has recognized that work product protection may also be vitiated by conduct of this sort because it "erode[s] the integrity of the adversary process."  *State of N.Y. v. Solvent Chemical Co., Inc.*, 166 F.R.D. 284, 289 (W.D.N.Y. 1996) (attorney secured witnesses' cooperation by using financial inducements).  Accord *Ward v. Maritz, Inc.*, 156 F.R.D. at 594 (the privilege "may be vitiated by the unprofessional or unethical behavior of an attorney or a party").

Perhaps the leading case addressing the improper use of investigators like Interfor to obtain evidence and admissions from other represented parties in a litigation is *Midwest Motor Sports v. Arctic Cat Sales, Inc.*, 347 F.3d 693 (8th Cir. 2003).  In that case, a franchise dispute

involving a snowmobile manufacturer and two retail franchises, the manufacturer's attorneys hired a private investigator, *inter alia,* (i) to question the sales manager of one of the franchises, (ii) to elicit admissions and evidence from salesmen of the franchises, and (iii) to tape record anything that one of the franchises' representatives might say about the lawsuit. The District Court imposed evidentiary sanctions against the manufacturer, and the Eighth Circuit affirmed.

*First*, the Court rejected the manufacturer's attorneys' argument that they sent the investigator only to speak to low-level employees for the purpose of becoming familiar with the relevant product line sold by the franchises, describing the argument as simply "passing the buck." *Id.* at 698. The Court elaborated: "Even if these factual assertions were true, lawyers cannot escape responsibility for the wrongdoing they supervise by asserting that it was their agents, not themselves, who committed the wrong. . . . Since a lawyer is barred under Rule 4.2 from communicating with a represented party about the subject matter of the representation, she may not circumvent the Rule by sending an investigator to do on her behalf that which she herself is forbidden to do." *Id.*

*Second*, the Court concluded that the investigator's conversations with a representative of the opposing party were "intended to elicit admissions" to be used at trial, and that "[w]here . . . attorneys elicit specific admissions from an opponent's low-level employees that the attorneys know would be advised against by the employer's counsel, we have no doubt that the ethical considerations in Rule 4.2 apply." *Id.* Furthermore, the Court stated that sanctions were further justified since the investigator's "interviews took place under false and misleading pretenses, which [the investigator] made no effort to correct."

*Third*, the Court found that the attorneys' instructions for the investigator to use recording devices was *unethical*, notwithstanding the fact that it was *legal* to make the recordings. *Id.* at 699. The Court concluded that the manufacturer was using the investigator's "undercover ruse to elicit damaging admissions from [the other parties] to secure an advantage at trial," and noted that such tactics fall squarely within Model Rule 8.4(c)'s prohibition of "conduct involving dishonesty, fraud, deceit or misrepresentation." *Id.* at 700.

It is noteworthy that the issue before the Eighth Circuit in *Midwest Motor Sports* with respect to conduct analogous to that at issue here, was what *sanctions* were appropriate in light of the misconduct of the attorneys and their investigators. The notion implicitly urged by NXIVM here -- where NXIVM improperly obtained information directly from its adversary, Ross -- that the subject matter of such an investigation should not be *discoverable* is simply ludicrous.

It has not yet been determined if Interfor recorded its sessions with Ross, although one can easily suppose that this sophisticated investigator did so. If so, both the fact of such recording and the recordings themselves are discoverable. There is no question that all statements of one party secretly audio- or videotaped by the other party concerning the subject matter of the litigation qualify as party statements and must be produced under Fed. R. Civ. P. 26(b)(3). *Costa v. AFGO Mechanical Services, Inc.*, 237 F.R.D. 21, 23 (E.D.N.Y. 2006) ("A party may obtain . . . a statement concerning the action or its subject matter previously made by that party"). It is settled law in the District of New Jersey, where discovery in the Ross Action proceeds, that secret recordings of witnesses made in connection with a lawsuit are not protected under the work product doctrine. *See Ward*, 156 F.R.D. at 598. Indeed, "[v]irtually all cases dealing with this issue have held that clandestine recordings of conversations with potential fact witnesses, *whether made by a party or by counsel, before or after counsel is consulted*, are not shielded under the work product doctrine." *Smith v. WNA Carthage, L.L.C.*, 200 F.R.D. 576, 578 (E.D. Tex. 2001) (emphasis added). Any memorialization of Ross's conversations with Interfor that O'Hara might possess or about which he is aware should be discoverable under the same principles.

NXIVM boasts that it hired Interfor, through counsel, to "assist them in gathering information including in connection with the Ross Action." Pl. Mem. at 7. Breathtakingly, the "assistance" that was performed by Interfor was the creation of an elaborate ruse -- the construction of a fictional "cover story," the hiring of an actress to portray a parent with a daughter caught-up in NXIVM, contacting Mr. Ross, then interviewing *and* retaining him -- a

party known to be represented by counsel -- for the purposes of unethically eliciting from him, outside the presence of his attorneys, everything he knew about NXIVM, "Vanguard" Raniere and "Prefect" Salzman.[20]    It is difficult to conceive of attorney conduct that more involves "dishonesty, fraud, deceit or misrepresentation" (*see* NY DR-1-102(A)(4); NJ RPC 8.4(c); *Midwest Motor Sports*, at 700), and that is more demonstrative of the broad range of "deception and deceit" encompassed within the crime-fraud exception to the attorney-client and work-product privileges.  *See Ocean Spray*, at 522; *see also Ward*, 156 F.R.D. at 594.  For these reasons alone, Ross has more than met his burden of "showing probable cause to believe that a crime or fraud had been committed and that the communications were in furtherance thereof."  *In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d at 1039.  He also has plainly made a *prima facie* showing that NXIVM intended to commit a fraud or crime, and that any attorney-client communications with Interfor concerning Ross were in furtherance of that alleged crime or fraud."  *In re Grand Jury Subpoena*, 223 F.3d 213, 217 (3d Cir. 2000).

### 2.    NXIVM Directed Interfor Unlawfully to Obtain Mr. Ross's Bank and Telephone Records

As Mr. Ross first learned from reporter Chet Hardin of Albany's *Metroland*, and as was reported in that publication on August 10, 2006, NXIVM hired Interfor to illegally obtain Mr. Ross's private banking records.  The Interfor Report, provided to Mr. Hardin, and ultimately to Mr. Ross, by Mr. O'Hara, contains Mr. Ross's detailed banking information, including balances, deposits, and the amount of individual checks written by Mr. Ross between August and October of 2004.  Interfor Report at 4 (Supp. Ross Decl. (Skolnik November Decl. Ex. C), Ex A).  The report also contains details of bank transactions made by Ross's roommate.  *Id.* Furthermore, the report demonstrates that Interfor also illegally obtained Mr. Ross's telephone records; it identifies persons with whom Ross had "frequent and notable contact[s]" between

---

[20]    There is thus delicious irony in NXIVM's reliance on cases where courts entered protective orders, *inter alia*, "prohibiting the plaintiff from contacting former patients of the defendant hospital," "preventing plaintiff from contacting defendant's customers," and generally "directing the conduct of the parties or their counsel."  Pl. Mem. at 16.

September 2002 and March of 2004.  We say *illegally* because we know of no *legal* way in which Interfor could have obtained Mr. Ross's bank and telephone records, or those of his roommate; and, as noted, Interfor and NXIVM have conspicuously declined to deny that they obtained them illegally.  Although O'Hara -- perhaps naïve about investigatory tricks of the trade -- assumed Interfor obtained the information by *bribing* bank and telephone company employees (Ross Decl. (Skolnik November Decl. Ex. B) ¶13), the information may also have been obtained by means of "pretexting" -- the widespread but wholly illegal practice of pretending to be the very person whose data is being sought.[21]   O'Hara also told Ross that Interfor had apparently bribed someone either working at or residing in Ross's apartment building to sort through his garbage -- an allegation made credible by the fact that a box of Ross's garbage had been sent to O'Hara by Interfor, which O'Hara asserts remains in his possession.  *Id.*

For these reasons, if NXIVM used its attorneys illicitly to obtain Mr. Ross's private information through Interfor, then unambiguously the attorneys "enable[d] or aid[ed] the client to commit a tort or crime" (*In re Heuwetter*, 584 F.Supp. 119, 127 (S.D.N.Y. 1984)), and the crime-fraud exception to the attorney-client and work product privileges is applicable.  See also *In re Grand Jury Proceedings*, 604 F.2d at 802 (exception applied where the "client used the lawyer's services to further a continuing crime or tort").  Importantly, the tortious conduct engaged in by NXIVM and Interfor now forms the basis for Mr. Ross's proposed Counterclaims against the responsible corporations and individuals.  Accepting NXIVM's assertion that O'Hara's testimony and the Interfor Report and other similar documents are *privileged* would be tantamount to excluding the very evidence that will allow Mr. Ross to prove his claims.  The crime-fraud exception precludes such a fundamentally unjust assertion of privilege.[22]

---

[21]   According to the Federal Communication Commission's Web site, "*pretexting* is the practice of getting your personal information under false pretenses.  *Pretexters* sell your information to people who may use it . . . to investigate or sue you.  *Pretexting* is against the law." Indeed, making a false statement to a financial institution is a federal crime under the Gramm-Leach-Bliley Act.

[22]   Because the Ross Action was transferred from this district under both 28 U.S.C. 1404 and 1406, a question arises -- which will be addressed by Magistrate Judge Falk and is beyond

>    **3.    The Cases Cited by NXIVM Approving "Investigations" of a Party In Active Litigation Involve Dramatically Different Factual Settings Than the Wholesale Intrusion Involved in This Case**

In a hollow attempt to justify its wholly improper contacts with Ross through Interfor, NXIVM cites a handful of cases that it asserts involve "nearly identical investigations" to the blatant improprieties perpetrated here.  Pl. Mem. at 39.  But these purportedly similar cases could not be more different from Interfor's "investigation" in this case.  Indeed, NXIVM's citations vividly demonstrate precisely how extraordinary and outrageous its actions in attempting to dupe and extensively "depose" Ross really are.  For example, in *Gidatex, S.r.L. v. Campaniello Imports, Ltd.*, 82 F. Supp. 2d 119, 126 (S.D.N.Y. 1999), the plaintiff used private investigators who posed as consumers and spoke to "*nominal parties not involved in any aspect of the litigation* … [Plaintiff's] investigators did not interview the sales clerks or *trick them* into making statements they otherwise would not have made.  Rather, the investigators *merely recorded the normal business routine* in the [Defendant's] showroom and warehouse." (Emphasis added).  Similarly, *Apple Corps Ltd. v. Inter'l Collectors Soc.*, 15 F. Supp. 2d 456 (D.N.J. 1998), involved not active litigation, but assessing compliance with a previously entered

---

the scope of this memorandum -- as to whether New York's or New Jersey's choice of law rules should apply to Ross's proposed tort counterclaims.  However, Ross submits that wherever this motion is decided, New Jersey law should govern Mr. Ross's potential tort counterclaims.  Assuming *arguendo* that New York choice-of-law rules apply, those rules require courts to apply the law of the state that has "the most significant contacts with the matter in dispute." *Employers Mut. Cas. Co. v. Key Pharmaceuticals, Inc.*, 871 F.Supp. 657, 661 (S.D.N.Y. 1994) (New Jersey law is applied to tort counterclaim because New Jersey is where the alleged torts principally took place).  An invasion of privacy tort clearly requires the application of New Jersey law because "where the plaintiff and defendant are domiciled in different states, the applicable law in an action where civil remedies are sought for tortious conduct is that of the situs of the injury." *Locke v. Aston*, 31 A.D.3d 33, 37-38 (N.Y.A.D. 2006) (Law where counterclaimant resides governs counterclaim for invasion of privacy).  At all times relevant to this litigation, Mr. Ross has resided in New Jersey.  While we need not belabor the point on this motion, New Jersey is the place where the alleged torts principally took place and where Ross has felt his injuries: *inter alia*, NXIVM and Interfor unlawfully obtained Ross's bank records from his bank in *New Jersey*; they unlawfully obtained Ross's *New Jersey* phone records; they contacted Ross under false pretenses in *New Jersey* to come to Interfor's office; and they searched and gathered Ross's garbage placed outside his home in *New Jersey*.

consent order.  Counsel and investigators for the licensor tested a licensee's compliance with the order by posing as *normal customers* in contacts with licensee's *low-level sales representatives*. Finally, *Garrett v. Metropolitan Life Ins. Co.*, 1996 WL 325725, at \*3,\*6 (S.D.N.Y. 1996), involved plaintiff's "[n]ational survey of [plaintiff's] policyholders who might have information regarding the alleged improper sales practices."  The court found this survey did not violate DR 7-104 because "before class certification, the putative class members are not 'represented' by the class counsel for purposes of DR 7-104."

Finally, NXIVM has not cited to any controlling authority for its assertion that the "crime-fraud exception is substantially narrower than Ross and O'Hara would like the Court to believe."  Pl. Mem. at 37.  In any event, arguments as to the scope of the exception are pending before the New Jersey court in the Ross Action, where the matter should more appropriately be resolved since it relates to conduct engaged in by NXIVM, Interfor and O'Hara in that litigation.

### 4.   Ross and the Court are Entitled to Discover What Other Criminal Mischief NXIVM and Interfor Conspired to Commit.

It cannot be disputed that Interfor, through its agents, Juval Aviv, Anna Moody, and the yet to be identified "Susan L. Zuckerman," asked Mr. Ross to perform an intervention for Ms. Zuckerman's fictional 27-year old daughter "Judy" *on a cruise ship*.  Ross Decl. (Skolnik November Decl. Ex. B) ¶ 6.  The facts reported to both the press and to Mr. Ross by O'Hara -- that NXIVM and Interfor concocted a plot to lure Mr. Ross *onto a cruise ship* -- have compelling indicia of credibility since Ross himself experienced the playing out of the attempt. Those facts should be fully investigated.

O'Hara told Ross that NXIVM and Interfor had also discussed having Ms. Keeffe portray "Judy," the daughter of "Susan L. Zuckerman."  According to O'Hara, Keeffe told him that the objective of the cruise ship plan was to "convert" Ross.  While it is not clear what Ms. Keeffe -- who O'Hara believes to have been brainwashed by Raniere and Salzman -- understood Raniere and Salzman to mean by "convert," one need not stretch the imagination to envision what it is that "Vanguard" and "Prefect" actually wanted to do to Mr. Ross on that cruise ship.

As far-fetched as it may sound, recent reports in the press -- including statements from Mr. Raniere's former girlfriend and NXIVM insider, Toni Natalie -- make clear that suppositions of sinister intent are not at all implausible.  The August 10, 2006 *Metroland* article more than suggests that "Vanguard" Raniere and "Prefect" Salzman have used brainwashing techniques on Natalie and others; it was reported that "[a]s a result of *therapy sessions* with Raniere and Salzman" (the very fact of which is itself bizarre) Natalie "became convinced that she had been responsible for the Nazi Holocaust."   Ross Decl. (Skolnik November Decl. Ex. B), Ex. D (emphasis added).  Furthermore, Natalie avowed that "if [Raniere] believes that something is 'right action' . . . it is OK to do whatever it takes.  If you had to kill somebody, and it is for the betterment of [NXIVM], it would be OK."  Further, O'Hara himself has confirmed receiving a death threat, spray-painted on his property after he began to speak out publicly against NXIVM. *See* Ross Decl. (Skolnik November Decl. Ex. B) ¶14.

Particularly in light of NXIVM's concession that it hired Interfor to "assist" with this litigation," if NXIVM and Interfor were plotting to lure Mr. Ross onto a cruise ship *for any purpose* it would constitute serious litigation misconduct that should result in the imposition of the severest of sanctions against NXIVM.   If NXIVM's attorneys were involved in this conspiracy, such conduct falls squarely within the expansive crime-fraud exception.

Since O'Hara told Mr. Ross that it was around the time that he learned of this plot that he concluded that he could no longer be a willing participant in NXIVM's conduct (*see* Ross Decl. (Skolnik November Decl. Ex. B) ¶14), the conclusion is all but inescapable that the so-called cruise ship plot was among the "activities that [O'Hara] believed to be illegal" and to which he was referring in his March 11, 2005 letter to Salzman, acknowledging that he had terminated his services in February 2005.  *See* Skolnik October Decl.(Skolnik November Decl. Ex. A), Ex. A.  Thus, to the extent O'Hara played a part in the early stages of NXIVM's baroque design, he withdrew from the conspiracy prior to Interfor's second meeting with Ross -- which, as Mr. Ross has documented, did not occur until April 20, 2005.  For this additional reason, it is

-33-

difficult to understand how any attorney-client or work-product privilege could possibly apply to conduct in which no attorney was involved.

For all of the reasons set forth above, Ross has clearly proposed a factual basis that "strike[s] 'a prudent person' as constituting 'a reasonable basis to suspect the perpetration or attempted perpetration of a crime or fraud, and that the communications were in furtherance thereof.'" *See Jacobs*, 117 F.3d at 87.[23]   Thus, Ross respectfully submits that this Court should make no ruling that would either preclude his obtaining any documentary evidence in O'Hara's possession relating to Interfor's investigation of Ross, or serve to bar a deposition of O'Hara. The Court should instead enable Magistrate Judge Falk: (i) to assess what information NXIVM and its counsel improperly obtained from Ross, and what sanctions are appropriate to remedy NXIVM's misconduct; (ii) to discover the extent of NXIVM's criminal and tortious misconduct to determine what other sanctions are appropriate; and (iii) to authorize the obtaining of additional evidence in support of Ross's Counterclaims against NXIVM, Interfor and the other individuals involved.

**B.     NXIVM Has Waived Any Attorney Client Privilege It Might Otherwise Have Been Able to Claim**

Even if plaintiffs' claims of attorney client privilege (*see, e.g.,* Pl. Mem. at 29-31) were not otherwise eliminated by the fatal defects that have conjured the crime-fraud exception, NXIVM has waived any attorney-client privilege by sharing the information with a third-party who was not within the attorney-client relationship.   Plaintiffs argue that sharing such information with *Interfor* "does not affect the privilege" (Pl. Mem. at 30), and Ross does not

---

[23]   Under the Third Circuit standard, Ross has made "a *prima facie* showing that (1) [NXIVM] was committing or intending to commit a fraud or crime [by means of its Interfor investigation], and (2) the [alleged] attorney-client communications were in furtherance of that alleged crime or fraud." *See In re Grand Jury Subpoena*, 223 F.3d at 217.

-34-

contend otherwise.[24]    It is instead *"Vanguard" Raniere's* participation in the NXIVM/Interfor/O'Hara plotting that may well have vitiated the privilege.

O'Hara asserts that "Vanguard" Raniere was a participant in discussions regarding the Interfor investigation, and Ross must be permitted to explore the details of that participation to determine if the privilege has been waived thereby.  During the entire course of the Interfor investigation, Raniere was not a party to the underlying Ross Action then pending in this Court,[25] and NXIVM maintains that Raniere has *no official status whatsoever* with NXIVM.  Instead, in a sworn interrogatory response NXIVM concedes that "Keith Raniere has never had any official status as an employee, independent contractor, officer, director, partner, or agent with either [NXIVM or First Principles, Inc.], nor has he ever had any ownership interest in either company. . . .  Mr. Reniere volunteers his time to act as an informal advisor to both companies." NXIVM Corporation and First Principles, Inc.'s September 29, 2006 Responses to Defendant Rick Ross's First Set of Interrogatories to Plaintiffs, at p.26, #26 (annexed to the Skolnik November Declaration as Ex. D).[26]   Given this wholesale lack of any relationship between NXIVM and Raniere other than as an "informal advisor," he cannot be considered a cognizable member of any NXIVM "control group," and his participation in the Interfor discussions and scheme waives any attorney client privilege that would otherwise apply.  *See Verschoth v. Time Warner, Inc.*, 2001 WL 546630 (S.D.N.Y. May 22, 2001) (Attorney-client and work product privileges were not available or were waived where communications were shared with a retired employee of the defendant who worked sporadically for defendant, but did not have an

---

[24]   Nor does Ross now take issue with Plaintiffs' arguments that O'Hara's disclosures have not in and of themselves waived the attorney-client or work product privileges (Pl. Mem. at 34-37).

[25]   Nor is Raniere a party to the O'Hara matter at bar.  Although he has apparently sought steadfastly to avoid party status, he is named as a Counterclaim Defendant in the proposed amended pleading now before the New Jersey court.

[26]   This interrogatory response is subject to a provisional confidentiality agreement between Ross and the plaintiffs in the Ross Action.  **It should not be placed on the public record before plaintiffs in that Action are permitted to register any objection.**

employment contract); *U.S. v. Schlesinger*, 438 F.Supp. 2d 76, 109 (E.D.N.Y. 2006) ("communications were not 'made in confidence' because individuals other than the attorney and client were present); *see also* 8 Wigmore, Evidence § 2311 ("One of the circumstances by which it is commonly apparent that the communication is not confidential is the presence of a third person who is not the agent of either client or attorney").

While New York courts have recognized "a narrow exception to this rule where privileged communications are shared with the client's agent" (*National Education Training Group, Inc. v. Skillsoft Corp.*, 1999 WL 378337, *3 (S.D.N.Y. Jun. 10, 1999), to avail itself of this exception, NXIVM would be required to establish that disclosure to Raniere was "necessary for the client to obtain informed legal advice" (*Id*. at *4), a showing that would be quite impossible here. *See also In re Grand Jury Subpoenas Dated December 18, 1981 and January 4, 1982*, 561 F.Supp. 1247, 1260 (E.D.N.Y. 1982) (company's ex-board-chairman had no legal cognizable need to know outside counsel's opinion, and therefore the opinion's dissemination to him destroyed the confidentiality of the communication). The "necessity" element means more than just useful and convenient, but rather requires that the involvement of the third party be nearly indispensable or serve some specialized purpose in facilitating the attorney-client communications. *National Education Training Group* at *4. For example, conversations between a client's counsel and an independent investment banker were held not to be privileged, even though the conversations significantly assisted the attorney in giving his client legal advice. *See U.S. v. Ackert*, 169 F.3d 136, 139 (2d Cir. 1999). Given NXIVM's acknowledgement that Rainiere has no official status with NXIVM whatsoever, and NXIVM's complete failure in the past and inability in the future to make any showing that Mr. Raniere was "nearly indispensable" for NXIVM to facilitate communications with counsel, the privilege has been waived. Because Raniere was not a party to the Ross Action as then constituted, he could have had no direct

attorney-client relationship in connection with that litigation; and under governing law he was not an "agent" of NXIVM, or of Interfor, or of O'Hara.[27]

> **C.    This Court Need Not Determine the Nature of Any Work Product In O'Hara's Possession, Because Such Work Product Is In Any Event Necessary for Ross's Prosecution of His Counterclaims in the New Jersey Action.**

Plaintiffs assert that "Interfor and O'Hara's work consisted of work product" (Pl. Mem. at 32), then go further to suggest that it is likely the more carefully protected variety of work product called "opinion work product." Pl. Mem. at 32-34.   While it is far from clear whether the work product at issue here (again assuming *arguendo* that O'Hara was NXIVM's lawyer) is, in fact, "opinion" rather than "fact" work product or some of each, those determinations should be made -- if at all -- in connection with Magistrate Judge Falk's crime-fraud analysis.

---

[27]    Although we need not belabor the matter here, there is yet another basis to conclude that plaintiffs have waived any otherwise applicable privileges.  By placing O'Hara's March 11, 2005 letter to Salzman on the public record and using it as a sword against O'Hara, Plaintiffs -- who both here and in the Ross Action seek to use that letter as a shield -- may be held to have waived the attorney-client privilege with respect to all communications on the *subject matter* of the "variety of activities" that O'Hara believes "to be illegal." *See* Skolnik October Decl. (Skolnik November Decl. Ex. A), Ex. A.  Under the subject matter waiver doctrine, voluntary disclosures of privileged communications made or used in a judicial setting -- or a judicial-type setting -- trigger subject matter waiver. *See In re von Bulow*, 828 F.2d 94, 103 (2d Cir. 1987) (subject matter waiver will be found if "the privilege-holder has attempted to use the privilege as both 'a sword' and 'a shield. . . .'").  Moreover, "[w]hen a party *voluntarily* waives attorney-client privilege, *that waiver extends to all communications pertaining to the subject matter of the communications.*" *GFI, Inc. v. Franklin Corp.*, 265 F.3d 1268, 1273 (Fed. Cir. 2001) (emphasis added) (holding that attorney's voluntary testimony in patent case about privileged communications with client resulted in subject matter waiver) (citing *Nguyen v. Excel Corp.*, 197 F.3d 200, 206 (5th Cir. 1999)); *see also PaineWebber, Inc. v. Zinsmeyer Trusts P'ship*, 187 F.3d 988, 992 (8th Cir. 1999) ("courts typically apply such a waiver to all communications on the same subject matter"); *Hawkins v. Stables*, 148 F.3d 379, 384 n.4 (4th Cir. 1998) ("[D]isclosure not only waives the privilege as to the specific information revealed," but also "as to the subject matter of the disclosure").  *See also Fullerton v. Prudential Ins. Co.*, 194 F.R.D. 100, 103 (S.D.N.Y. 2000) (by disclosing privileged information "concerning its investigation of [plaintiff's] claims," company "waived its attorney-client privilege as to all other communications on the same subject").

Since Plaintiffs fail here as they have in the Ross Action to identify or describe the specific nature of a single one of the documents or communications they purport to protect, neither this Court, the New Jersey court, nor Ross can possibly evaluate and respond substantively to plaintiffs' work product arguments, but are simply left to take on faith sweeping statements like "O'Hara's work product constitutes 'opinion' work product."  Pl. Mem. at 32. Moreover, while plaintiffs' claim here, as they do in New Jersey, that such "opinion" work product "is not subject to discovery as there are no 'exceptional circumstances' present" (*id.*), it is difficult to conceive of circumstances more "exceptional."

Courts have recognized that where materials that would otherwise be deemed privileged are directly at issue in a litigation, the burden of establishing "substantial need" and/or "extraordinary circumstances" is satisfied, and discovery of such materials should be permitted. *See Reavis v. Metropolitan Property and Liability Ins. Co.*, 117 F.R.D. 160, 163-65 (S.D. Cal. 1987) (permitting discovery of both fact and opinion work product contained in insurance company claims file, where issue in the case was insurance company's bad faith in handling insurance claim); *Bird v. Penn Central Co.*, 61 F.R.D. 43, 47 (E.D. Pa. 1973) (attorney work product materials discoverable where directly relevant to claim or defense);  *AM International, Inc. v. Eastman Kodak Co.*, 217 U.S.P.Q. 1001, 1002 (N.D. Ill. 1982) ("An attorney's work product is discoverable where such information is directly at issue and the need for production is compelling").  The rationale in *Reavis* and the other cases cited above is equally applicable in the analogous situation presented here, where Ross and Magistrate Judge Falk need to unearth the details of the egregious misconduct that has taken place during the pendency of the underlying Ross litigation.

To respond to a NXIVM request in the Ross Action that Ross "disclose" all information he obtained from O'Hara, Ross prepared a Supplemental Declaration (Skolnik November Decl. Ex. C) that discloses everything he can recall O'Hara telling him about NXIVM during the various phone calls O'Hara placed to Mr. Ross.  That Supplemental Declaration also provided Magistrate Judge Falk with a copy of the Interfor Report -- the *only* document O'Hara

has given to Ross.  As set forth above, to the extent these communications pertain to the unlawful and tortious Interfor investigation, they cannot escape the crime-fraud exception to the attorney-client and work product privileges.  Indeed, the Interfor Report is *evidence* of one or more crimes or torts, and does not, in any event, reveal any attorney opinions or advice.

For all of the aforementioned reasons, even if this Court decides to exercise its discretion and rule on plaintiffs' motion to quash, that motion should be denied.  However, Ross respectfully submits that the better practice would be to defer ruling on the quash motion until Magistrate Judge Falk has determined the applicability of the crime-fraud exception to the documents and testimony Ross seeks from O'Hara.  Ross also respectfully requests that any protective order this Court may deem appropriate to enter imposing restrictions on O'Hara's future conduct not interfere with or otherwise provide a basis to object to such discovery as Magistrate Judge Falk might deem appropriate -- including a deposition of O'Hara -- in connection with Ross's prosecution of his Counterclaims in the Ross Action.

## CONCLUSION

For all of the reasons set forth above, this Court should (i) limit the restrictions contained in any protective order in a manner that will accommodate future discovery authorized by the New Jersey court in the Ross Action, and (ii) should stay its consideration of the motion to quash the O'Hara subpoena in deference to the New Jersey court's resolution of the crime-fraud and privilege issues that await decision there.   Should this Court choose to rule on plaintiffs' motion to quash, it should be denied in its entirety.

Respectfully submitted,
LOWENSTEIN SANDLER PC
65 Livingston Avenue
Roseland, New Jersey 07068
(973) 597-2508 (Phone)
(973) 597-2509 (Fax)
Attorneys for Intervenor Rick Ross

By:   /s/ Peter L. Skolnik
        Peter L. Skolnik (PLS 4876)

Dated:  November 17, 2006

Of Counsel:
Thomas F. Gleason, Esq.
GLEASON, DUNN, WALSH & O'SHEA
40 Beaver Street
Albany, New York 12207
(518) 432-7511 (Phone)
(518) 432-5221 (Fax)

Douglas M. Brooks, Esq.
MARTLAND AND BROOKS LLP
225 Franklin Street, 16th Floor
Boston, MA 02110
(617) 742-9720 (Phone)
(617) 742-9701 (Fax)